**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT M. PODLASEK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 2357 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| OFFICE OF STATE'S ATTORNEY OF | ) | |
| COOK COUNTY AND COUNTY OF COOK | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

After being arrested on suspicion of drunk driving, Plaintiff Robert Podlasek was placed

on paid administrative leave and ultimately fired from his position as a Cook County Assistant

State's Attorney ("ASA"). Podlasek filed this discrimination suit against Defendant Office of

State's Attorney of Cook County (the "SAO"), alleging that they fired him based on his

disability, Parkinson's disease, in violation of the Americans with Disabilities Act (the "ADA"),

42 U.S.C. § 12101 *et seq*., and the Illinois Human Rights Act (the "IHRA"), 775 Ill. Comp. Stat.

5/1-101 *et seq*. Podlasek further claims that the SAO failed to accommodate his disability and

retaliated against him for seeking an accommodation, in violation of the ADA and the IHRA,

and that the SAO improperly terminated him because he was arrested, in violation of the IHRA.

Podlasek also sued Defendant Cook County for indemnification for any judgment against the

SAO. Defendants have moved for summary judgment. Because Podlasek cannot establish the

required elements of his ADA and IHRA claims, the Court grants Defendants' motion for

summary judgment.

# BACKGROUND

## I.    Motion to Strike

As an initial matter, the Court must address Defendants' motion to strike Podlasek's statement of additional facts.  The Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires parties to submit a joint statement of undisputed facts.  Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, https://www.ilnd.uscourts.gov/ judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==; *see Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures).  The party opposing summary judgment may, however, submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material.  Judge Ellis, Summary Judgment Practice.  These additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process.  *See id.* ("The parties may not file—and the Court will not consider—separate statements of undisputed facts.").

Defendants ask the Court to strike Podlasek's statement of additional facts, arguing that it inappropriately contains: (1) undisputed facts that should have been included in the parties' joint statement; (2) additional facts that are contradicted by the parties' joint statement; and (3) the same facts as included in the joint statement but with minor variations.  As the Court previously indicated, it will not consider additional undisputed facts that Podlasek should have included in the parties' Joint Statement of Undisputed Facts or additional facts that directly contradict what the parties previously agreed was undisputed.  Doc. 51; *see Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 981–82 (7th Cir. 2019) (finding that this Court did not abuse its discretion in striking a party's statement of additional facts for noncompliance where the

additional facts were undisputed and could have been included in the parties' joint statement of undisputed facts). The Court agrees that Podlasek's statement of additional facts does not comply with the Court's summary judgment procedures, particularly given that Podlasek could have sought a ruling as to whether these facts were undisputed in connection with the parties' joint motion on proposed Local Rule 56.1 statement of undisputed material facts. Doc. 34. Nonetheless, for purposes of completeness, in the analysis section, the Court will note the reasons why, even were the Court to consider Podlasek's additional facts, they do not create a material dispute of fact.

## II.    Facts[1]

### A.    Podlasek's Arrest and Termination

Podlasek worked as an ASA for the SAO from June 3, 2003 until May 8, 2018, when the SAO terminated him after his arrest on suspicion of driving under the influence of alcohol. On May 4, 2018, Podlasek met a colleague for lunch and shared a bottle of wine. Sometime later that day, he drove to a restaurant to pick up dinner for himself and his wife. While waiting for his order, Podlasek had two more drinks—a glass of wine and an old fashioned. On his way home from the restaurant, Podlasek was involved in a rear-end collision but fled the scene, parked in his driveway, and began arguing with the other driver. Podlasek then offered the other driver $20 if he did not report the accident to the police. Eventually, Barrington Police Department ("BPD") officers arrived and observed that Podlasek appeared "unsteady on his feet, smelled of alcohol, and admitted to having one glass of wine at dinner." Doc. 41 ¶ 20. The BPD officers arrested Podlasek for suspicion of driving under the influence of alcohol.

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and takes all facts in the light most favorable to Podlasek, the non-movant.

During the course of the arrest, Podlasek was belligerent towards the BPD officers and attempted to use his position as an ASA to influence them, including:

- Stating "how many times do I have to say I'm a state's attorney." *Id.* ¶ 19.
- Telling the officers various times "fuck you" or "fuck off," including responding "[f]uck you, how's that?" to a BPD officer's command to move away from a garbage can on which he was leaning. *Id.* ¶ 21, 41.
- His wife asking a BPD officer to "show professional courtesy towards" Podlasek, which the officer understood to mean he "should show [Podlasek] special treatment based on his status as a State's Attorney." *Id.* ¶ 22.
- While being transported for booking he was "rude and argumentative" and made "demeaning comments about the intelligence of the police officers." *Id.* ¶ 24.

The following day, May 5, 2018, Podlasek had no recollection of the arrest or the events leading up to the arrest. Also on May 5, the State's Attorney's First Assistant, Joseph Magats, received a phone call from a supervising ASA for Rolling Meadows, Maria McCarthy, who informed him that Podlasek was involved in a hit-and-run, arrested for DUI, and engaged in "wholly inappropriate" conduct towards the BPD officers, including "not following instructions, not following lawful orders, was belligerent with them, was cursing them, and was repeatedly telling them that he was an assistant state's attorney." *Id.* ¶ 37. Magats, who was a member of the SAO's executive team, notified the other members of the executive team about the phone call and stated that he would be receiving the arrest reports on May 7. Jennifer Ballard Croft, who was the Chief of Staff at the SAO and a member of the executive team, and Magats decided to place Podlasek on paid administrative leave, which Kathy Wallace, the SAO's Director of Human Resources, communicated to Podlasek on May 5.

On May 7, Magats received the BPD arrest reports, which he testified he provided to Ballard Croft the same day. Magats reviewed the arrest reports and found that Podlasek's conduct was worse than described by McCarthy on the May 5 phone call. Based on this information, Magats recommended to Ballard Croft that the SAO terminate Podlasek because his

behavior leading up to and during the arrest "called into question public confidence and public trust in the office" and otherwise affected the "interests or operations of the SAO," which violated Section 2.14 of the SAO's employee handbook. *Id.* ¶ 47. Section 2.14 provides:

> There is a significant public interest in the integrity of the state's attorney's office and its employees. Public confidence in the SAO can be shaken when SAO employees engage in illegal activities or other conduct that places the SAO in a bad light. As a result of off-duty conduct, . . . that A) is related to the interests or operations of the SAO or the duties of the employee and, B) is either illegal, adversely affects the operations or service of the office, otherwise places the SAO in a bad light or is contrary to the mandate or mission of the SAO may result in disciplinary action up to and including termination.

Doc. 41-4 at 18.

Also on May 7, Podlasek submitted a request on the SAO's website to use sick time, which was denied. The same day, Podlasek and his wife called the SAO's Human Resources Department to request information about disability benefits. The SAO has a written procedure laid out in the employee handbook explaining that "employees requiring special accommodations as a result of a disability must notify the director of human resources in writing as soon as possible after the need for such accommodations has been identified." Doc. 41 ¶ 73.

On May 8, Ballard Croft made the final decision to terminate Podlasek, which Wallace communicated to Podlasek. Magats testified that the decision to terminate Podlasek was not based on Podlasek's refusal to answer the BPD officers' questions, refusing field sobriety tests, or the fact that he was arrested, but instead was based on his conduct during the arrest.

### B. Podlasek's Parkinson's Disease

Podlasek suffers from Parkinson's disease, which can present with symptoms mimicking alcohol use. While he did not receive a formal diagnosis until May 10, 2018, he began experiencing symptoms around May 2017, including: "speech changes including speaking

slower, softer, and slurring; slowed movement, including making simple tasks difficult and time-consuming, impaired posture and balance, and left arm stiffness and loss of movement, rigid muscles that are painful and limit range of motion, episodes of confusion and disorientation, sleeping problems and fatigue, tremors and shaking effecting ability to use hands, and depression and emotional changes, including fear, anxiety and loss of motivation." *Id.* ¶ 56. Notwithstanding his symptoms, Podlasek testified that his Parkinson's did not affect his ability to do his job.

In March 2018, Deidre Dyer, Podlasek's direct supervisor, told him that her boss, Dave Williams, expressed concern that Podlasek may be drinking on the job. Podlasek assured her that he was not and informed Dyer that he was seeing a specialist in connection with his symptoms and undergoing neurological testing to determine if he has Parkinson's disease. Shortly after his discussion with Dyer, Podlasek met with both Williams and Dyer to request time off for additional neurological testing and explained that Parkinson's symptoms can mimic alcohol use. His request was approved and Williams stated "please take as much time as you need." *Id.* ¶ 59. Podlasek believes his primary care physician orally diagnosed him with Parkinson's in early 2018, although no documentation of this diagnosis exists.

Following his arrest, Podlasek received a further evaluation by two specialists: Dr. Gian Pal, a neurologist trained in treating patients with Parkinson's, and Dr. Peter Dodzik, a clinical neuropsychologist. On May 10, 2018, Dr. Pal formally diagnosed Podlasek with Parkinson's. Neither doctor believed the type of loss of consciousness or amnesia Podlasek experienced was consistent with Parkinson's and Dr. Pal suggested that instead it could have been a result of Podlasek's alcohol consumption the day of the arrest. Both doctors also testified that Podlasek's aggressive behavior was not likely attributable to his Parkinson's.

6

Prior to terminating Podlasek, neither Ballard Croft nor Magats knew that he suffered from Parkinson's disease, and Magats testified that even if he had known, it would not have affected his recommendation to terminate Podlasek because it "would have no bearing on his attitude" towards the officers or his "attempt to influence the outcome." *Id.* ¶ 49.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.     Discrimination Claims

Podlasek brings disability discrimination claims under both the ADA and the IHRA, and the Court uses the same analysis for these claims. *Luckett v. Human Rights Comm'n*, 210 Ill. App. 3d 169, 180 (1989) ("When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims."). The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a claim for disability discrimination under either the ADA or the IHRA, Podlasek must demonstrate that the evidence, considered as a whole, would permit a reasonable factfinder to conclude that his disability caused an adverse employment action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686–87 (N.D. Ill. 2017) (applying *Ortiz* to ADA claims); *Reed v. Freedom Mortgage Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) ("Illinois courts apply the federal Title VII framework to claims of discrimination made under the [IHRA]."). Prior to *Ortiz*, courts distinguished between "direct" and "indirect" methods of analyzing discrimination claims. *Ortiz*, 834 F.3d at 763–64. *Ortiz*, however, eliminated this distinction and directed courts to ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge or other adverse employment action." *Id.* at 765.

But, even after *Ortiz*, the *McDonnell Douglas* burden-shifting framework still proves useful for analyzing discrimination claims. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("[B]oth before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence . . . in discrimination cases."). While the parties do not explicitly frame their arguments using the *McDonnell Douglas* framework, the Court finds it a useful means for organizing the parties' arguments. To establish a *prima facie* case under the *McDonnell Douglas* framework, Podlasek must show that: (1) he was disabled under the ADA; (2) his job performance met the SAO's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated individuals, who were not disabled, received more favorable treatment. *Brooks v. Avancez*, 39 F. 4th 424, 434 (7th Cir. 2022). If Podlasek establishes a *prima facie* case, the burden shifts to the SAO to articulate a legitimate, non-discriminatory reason for Podlasek's termination, which Podlasek may then attack as pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Court will first consider the evidence through the *McDonnell Douglas* framework, and then turn to a cumulative review of the evidence "to determine whether it permits a reasonable factfinder to determine that" Podlasek was terminated because of his disability. *David*, 846 F.3d at 224.

A.    ***McDonnell Douglas***

The SAO does not challenge whether Podlasek's termination qualifies as an adverse employment action or whether Podlasek can identify a similarly situated individual whom it treated more favorably. As such, the Court addresses only the remaining two elements: whether Podlasek was disabled under the ADA and whether his job performance met the SAO's legitimate expectations.

### 1.    Disabled Under the ADA

The ADA defines a disability as (1) a "physical or mental impairment that substantially limits one or more major life activities," (2) a record of a disability, or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(1).  "Merely having a physical injury or medical condition is not enough" to qualify as disabled under the ADA.  *Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011).

While Podlasek did not receive a formal diagnosis of Parkinson's until May 10, 2018, five days after the SAO placed him on administrative leave, he asserts that his primary care physician, Dr. Linn, first diagnosed him with Parkinson's in March 2018.  Although the date of formal diagnosis may be helpful in understanding when Podlasek began experiencing symptoms, he need not obtain a formal diagnosis to receive coverage under the ADA.  *See* 42 U.S.C. § 12101(1).  Rather, the question is whether at the time of the adverse employment action Podlasek had a "physical or mental impairment that substantially limit[ed] one or more major life activities."  *Id.*  The ADA defines "major life activities" to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* § 12102(2).  Podlasek testified that he suffers among other things, speech changes, including speaking slower and softer, and slurring, as well as impaired posture and balance affecting walking and standing.  *See* Doc. 41 ¶ 56.  The SAO argues that Podlasek's testimony addresses only how his Parkinson's *currently* limits his major life activities, which does not suffice to show that these limitations began *prior* to his suspension and termination, making him a qualified individual under the ADA.  *See E.E.O.C. v. S&C Elec. Co.*, 303 F. Supp. 3d 687, 689 (N.D. Ill. 2018) ("Whether an individual is a qualified individual with a disability is determined at the time

of the employment decision." (quoting *Hamm v. Exxon Mobil Corp.*, 223 F. App'x 506, 508 (7th Cir. 2007)). While the question posed at Podlasek's deposition focused on his current symptoms ("Q: As your sit here today, how would you describe how Parkinson's disease affects your daily life?," *see* Doc. 41-3 at 8), his answer is consistent with the symptoms observed by Williams and Dyer that led to questions of whether Podlasek was drinking on the job (e.g., slurred speech and impaired walking). Based on this record, a reasonable jury could find that Podlasek had a qualifying disability at the time of the adverse employment action.[2]

## 2. The SAO's Legitimate Expectations

The SAO also argues that Podlasek's discrimination claims fail because he cannot show that he was meeting the SAO's legitimate expectations at the time of his termination. Instead, they maintain that the evidence demonstrates that his conduct leading up to and during the arrest violated the SAO's policies found in its employee handbook. Podlasek responds that the SAO did not obtain the police reports, which contained the details of the arrest, until June 28, 2021, when it produced a copy of the police reports in discovery in this action. According to Podlasek, this makes the details of the arrest after-acquired evidence that cannot retroactively justify his termination. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employer was fired for the nondiscriminatory reason."); *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) ("[A]fter-acquired evidence . . . does not bar all relief, although it can limit recoverable damages."). Without such evidence, he maintains that his work performance was otherwise adequate and so he was meeting the SAO's legitimate expectations.

---

[2] Podlasek also argues that he is covered by the ADA because he was "regarded as" having an impairment. Because the Court finds that a genuine issue of fact exists as to whether Podlasek suffered from an impairment that substantially limited his major life activities, the Court does not address this alternative argument.

But the undisputed facts contradict Podlasek's argument as to when the SAO obtained the police reports and the information contained therein. The record reflects that on May 5, 2018, Magats received a phone call from McCarthy, who reported that Podlasek was arrested for hit-and-run and DUI. According to Magats, McCarthy further described Podlasek's attitude towards the police officers as "wholly inappropriate," including cursing at officers, being belligerent, and repeatedly telling them that he was an ASA. *See* Doc. 41 ¶ 37. Magats then notified the rest of the SAO executive team of the phone call and indicated he expected to receive the police report on the following Monday, May 7. Magats received and reviewed the police reports as expected on May 7, describing the reports as containing worse information than what McCarthy had told him over the phone. He also testified that he shared the report with Ballard Croft that same day.[3] Although the reports may have only been produced in discovery on June 28, 2021, because the undisputed evidence shows that Magats obtained and reviewed the police report on May 7, 2018, the police report does not amount to after-acquired evidence, meaning the Court can consider the details of his arrest.

Podlasek's behavior during the arrest violated Section 2.14 of the SAO's employee handbook because it "'called into question public confidence and public trust in the office by his actions,' and otherwise effected the 'interests or operations of the SAO.'" Doc. 41 ¶ 47. This failure to comply with the SAO's policies demonstrates that, at the time of his termination, he failed to meet the SAO's legitimate expectations. *See Slutsky v. Jacobson Cos.*, No. 16-cv-1073,

---

[3] Podlasek points to testimony from Ballard Croft that she did not review the police report, *see* Doc. 48 at 3, however, Ballard Croft also testified that the decision to terminate Podlasek was based on the information Magats, who had reviewed the police report, relayed to her. *See* Doc. 47 ¶ 11 (Q: Was your final decision to terminate the Plaintiff's employment based off of the oral communications you had with Joe Magats? A: Yes."). Thus, while Ballard Croft may not have reviewed the report herself, the undisputed evidence supports the finding that Magats relayed the information from the police report to Ballard Croft. Podlasek also argues that no formal investigation occurred, but again, this does not create a question of fact as to whether Magats and Ballard Croft knew of the details of the arrest prior to making the decision to terminate Podlasek given the parties' agreement to this fact. *See* Doc. 41 ¶¶ 37–43.

2017 WL 2813662, at *5 (N.D. Ill. June 29, 2017) (finding that violating company policies means an employee is not meeting legitimate expectations and collecting cases); *see also Pernice v. City of Chicago*, 237 F.3d 783, 785–86 (7th Cir. 2001) ("It is well-established that an employee can be terminated for violations of valid work rules that apply to all employees, even if the employee's violations occurred under the influence of a disability."). The fact that Podlasek may have otherwise received positive or adequate evaluations does not create a question of fact on this issue. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017) (finding that evidence presented demonstrated that the employer was clearly not satisfied with the plaintiff's job performance, notwithstanding the positive ratings he received on his year end performance reviews); *Fortier v. Ameritech Mobile Commc'ns*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("[E]arlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."); *cf. Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) ("Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies."). Thus, Podlasek cannot establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework.

### B. Cumulative Assessment of the Evidence

"A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question of whether 'a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [adverse employment action.]'" *Zegarra v. John Crane, Inc.*, 218 F.

Supp. 3d 655, 665–66 (N.D. Ill. 2016) (alterations in original) (quoting *Ortiz*, 834 F.3d at 765).

Rather, the Court must also consider whether Podlasek's evidence would cause "a reasonable

factfinder to determine" that his disability was the motivating factor for his termination.

*Aberman*, 242 F. Supp. 3d at 686–87, 690–91 (after addressing the *McDonnell Douglas* test,

cumulatively assessing "all the evidence" to determine if the plaintiff could prove a case of

disability discrimination at trial).

At the outset, the parties disagree with whether the decisionmakers knew of Podlasek's

Parkinson's. Podlasek argues that the SAO knew of his disability because he told Dyer and

Williams in March 2018 that he was undergoing testing for Parkinson's. But the record does not

support a finding that Dyer and Williams passed this information on to Magats or Ballard Croft.

Rather, the undisputed evidence establishes that Magats did not know of Podlasek's Parkinson's

at the time of the termination decision, *see* Doc. 41 ¶ 49, with Ballard Croft also testifying that

she did not know Podlasek before making the decision to terminate him, *id.* ¶ 50.[4] The fact that

the decisionmakers did not know of Podlasek's disability at the time they made the decision to

terminate them thus indicates that they did not take that action because of his disability. *See*

*Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) ("[A]n employer cannot be liable

under the ADA for firing an employee when it indisputably had no knowledge of the

disability. . . . If it does not know of the disability, the employer is firing the employee 'because

of' some other reason.").

---

[4] Podlasek points to Dyer's conversations with Podlasek's wife discussing his health condition, Dyer's indication that she had passed information along to others at the SAO, and an email Wallace forwarded to Magats and Ballard Croft indicating that Podlasek's wife had information she wanted to convey about his health as evidence that Magats and Ballard Croft knew of Podlasek's Parkinson's. The mere fact that Dyer stated she passed information along to others does not allow for the inference that the "others" included Magats and Ballard Croft. As for Wallace's email, at most, this only suggests that they learned of some health concerns close in time to when the termination decision was communicated to Podlasek and does not contradict the parties' agreed fact that Magats, and hence Ballard Croft, did not know Podlasek had Parkinson's at the time they made the decision to terminate his employment.

Further, the record does not allow for a finding of pretext.  To show pretext, Podlasek must demonstrate that "(a) the [SAO's] nondiscriminatory reason was dishonest; and (b) the [SAO's] true reason was based on a discriminatory intent." *E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006).  "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  The Court looks to the honesty of the employer's explanation, not its validity or reasonableness.  *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Podlasek argues that because Ballard Croft did not recall receiving or reviewing the arrest reports, the SAO's explanation that it fired him based on his conduct during the arrest is pretext. The undisputed facts show the following, however: (1) on May 5, 2018, Magats received a phone call from McCarthy detailing Podlasek's conduct during the arrest; (2) Magats told the executive team the details of the phone call and stated he would be receiving the arrest reports on May 7; (3) on May 7, Magats received the arrest reports and described Podlasek's behavior as being worse than McCarthy had described; and (4) Magats told Ballard Croft about the contents of the arrest reports and recommended the SAO terminate Podlasek.  Thus, even if Ballard Croft never reviewed the arrest reports, she knew that Podlasek engaged in conduct that violated the SAO's policies at the time she made the decision to terminate him.  Podlasek has not presented any evidence that calls into question the honesty of this explanation, and so no question of fact exists as to whether the SAO terminated him for pretextual reasons.

In summary, because the undisputed evidence does not support an inference that the SAO terminated Podlasek because of his disability, the Court grants summary judgment for the SAO on Podlasek's discrimination claims.

## II. Accommodation Claims

The ADA and the IHRA also prohibit an employer's refusal to make reasonable accommodations for known mental or physical limitations of an otherwise qualified individual with a disability. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)). Podlasek's failure to accommodate claims stem from his request to use sick time on May 7, 2018, which the SAO denied. The SAO argues that Podlasek never sought an accommodation because his request to use sick time did not follow the SAO's procedure for requesting an accommodation and because using sick time was unnecessary given that Podlasek was on paid administrative leave.

The SAO's employee handbook provided that to request an accommodation, an employee must: "notify the director of human resources in writing as soon as possible after the need for such accommodations has been identified." Doc. 41 ¶ 73. On May 7, 2018, Podlasek submitted a request to use sick time via the SAO's online portal. The record, however, does not include the contents of Podlasek's request to use sick time, but he claims it was for "time-off due to his medical condition." Doc. 48 at 14. He points out that intermittent time off or a short leave of absence may be an appropriate accommodation under the ADA, Doc. 48 at 14 (citing *Severson v. Heartland Woodcraft*, 872 F.3d 476, 481 (7th Cir. 2017)), and that his request to use sick time on May 7 should have triggered an interactive process. Even assuming that Podlasek's request contained enough information such that the SAO should have understood it to be a request for accommodation, his claim fails. The ADA requires only that an employer provide an

"appropriate accommodation under the circumstances." *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). On May 7, Podlasek was already on paid administrative leave, so there would have been no need to use a sick day. Whether he was allowed to use sick time or whether the SAO attributed the time off to his administrative leave, the SAO accommodated Podlasek's request.

Podlasek further argues that his request should have triggered an interactive process. But "liability arises from these types of allegations only when 'the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021) (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). Podlasek seems to suggest that this process may have led to additional accommodations that would have prevented his termination. But no accommodation could change Podlasek's behavior during the arrest, and the undisputed evidence shows that even if Magats and Ballard Croft had known of his Parkinson's, it would not have affected their decision to fire him. Doc. 41 ¶ 49; *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) ("In this area of the law, we are primarily concerned with the ends, not the means: Because the interactive process is not an end in itself, it is not sufficient for [an employee] to show that [an employer] failed to engage in an interactive process or that it caused the interactive process to break down." (quoting *Rehling*, 207 F.3d at 1015–16 (alterations in original))). Therefore, the Court grants Defendants' motion for summary judgment as to the failure to accommodate claims.

## III. Retaliation Claims

The ADA and the IHRA prohibit retaliation against employees who engage in statutorily protected activity. *Koty v. DuPage Cnty.*, 900 F.3d 515, 519 (7th Cir. 2018); *Terada v. Eli Lily*

& Co., 2015 IL App (5th) 140170, ¶ 25. To prevail on his retaliation claim, Podlasek must
establish that (1) he engaged in a protected activity, (2) he suffered a materially adverse action,
and (3) a causal connection exists between the two. *Kotaska v. Fed. Express Corp.*, 966 F.3d
624, 632 (7th Cir. 2020) (ADA); *Terada*, 2015 IL App. (5th) 140170, ¶ 25 (IHRA). Podlasek
may establish his claim with circumstantial evidence, including "(1) suspicious timing;
(2) ambiguous statements or behavior towards other employees in the protected group;
(3) evidence, statistical or otherwise, that similarly situated employees outside of the protected
group systematically receive[d] better treatment; and (4) evidence that the employer offered a
pretextual reason for an adverse employment action." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th
931, 937 (7th Cir. 2022). The Court considers the evidence "as a whole" to determine whether it
"would permit a reasonable factfinder to conclude that the plaintiff's [engaging in a protected
activity] caused the . . . adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Rowlands
v. United Parcel Serv.*, 901 F.3d 792, 801 (7th Cir. 2020) (applying *Ortiz* to a retaliation claim).

Podlasek argues that his request to use sick time on May 7, 2018 was a request for an
accommodation. Although the SAO argues that Podlasek never made a request for
accommodation, it acknowledges that such a request would qualify as a protected activity under
the ADA and the IHRA. *See Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461
F.3d 932, 938 (7th Cir. 2006) (finding that the plaintiff "engaged in statutorily protected
expression when he requested an accommodation"). Assuming that Podlasek engaged in
protected activity, Podlasek has nonetheless failed to create a question of fact as to causation. He
bases his entire argument again on his contention that the SAO did not have the arrest reports
when it decided to terminate him, which he argues shows that the SAO decided to fire him in
retaliation for his request. But, as discussed *supra*, the undisputed evidence does not bear this

out. Magats received and reviewed the police report prior to recommending the SAO terminate

Podlasek, and he honestly believed that Podlasek's behavior during the arrest justified his

termination. Further, even if Magats or Ballard Croft did not review the police report or conduct

any investigation into Podlasek's arrest, the evidence shows that neither knew that Podlasek had

Parkinson's, let alone that he submitted a sick day request. *See Cervantes v. Ardagh Group*, 914

F.3d 560, 566–67 (7th Cir. 2019) (holding retaliation claim fails where decisionmaker was

unaware of protected activity). This also means that any argument concerning the timing of the

termination one day following the sick day request fails to create a triable issue. *See Kidwell v.

Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("[S]uspicious timing will rarely be sufficient in

and of itself to create a triable issue. . . . Accordingly, for a suspicious-timing argument alone to

give rise to an inference of causation, the plaintiff must demonstrate that an adverse employment

action follows close on the heels of protected expression, and the plaintiff [must] show that the

person who decided to impose the adverse action knew of the protected conduct." (second

alteration in original) (citations omitted) (internal quotation marks omitted)). Therefore, the

Court grants Defendants' motion for summary judgment as to the retaliation claims.

## IV.     Improper Use of Arrest Claim

The IHRA prohibits an employer from using "an arrest record . . . as a basis to . . . act

with respect to . . . discharge [or discipline.]" 775 Ill. Comp. Stat. 5/2-103(a). But the IHRA

does not prevent an employer from firing an employee for the conduct that gave rise to the arrest.

*See Murillo v. City of Chicago*, 2016 IL App (1st) 143002, ¶ 27–28 (noting that "an arrest report

can include a wealth of detail on which an employer might rely" and that even short of a

conviction, "[t]his information could be sufficiently persuasive to 'indicate' that the person

actually engaged in the conduct for which he or she was arrested"); *see also Franklin v. City of*

*Evanston*, 384 F.3d 838, 846 (7th Cir. 2004) (finding no violation of the IHRA where an employee was terminated after an arrest for possession of marijuana because possession violated his employer's workplace policies, not merely for the fact he was arrested).

Podlasek again argues that the SAO did not have the arrest report at the time it decided to terminate him. As discussed *supra*, on May 5, Magats received a phone call from ASA McCarthy describing the arrest, and on May 7, he received and reviewed the arrest report. The record supports only a finding that Podlasek was fired based on his conduct during the arrest, not the mere fact that he was arrested.[5] Therefore, the Court grants Defendants' motion for summary judgment as to the improper use of arrest claim.[6]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [39] and motion to strike [49]. The Court enters judgment for Defendants on Podlasek's complaint. Case terminated.

Dated: December 14, 2022

SARA L. ELLIS
United States District Judge

---

[5] Podlasek points to a note Wallace made on May 8, 2018, which included a bullet reading "arrest discrimination," under which she wrote "due [sic] own investigation," "interview employee," "speak to witnesses," and "if he admits what took place then we are good." Doc. 47 ¶ 9. He argues from these notes and the fact that the SAO did not conduct a formal investigation that a question exists as to whether the SAO based his termination on the mere fact of his arrest. But Wallace's notes do not create any such question given that the parties agreed that she had no involvement in the decision to terminate Podlasek. *See* Doc. 41 ¶ 30 ("Wallace is not involved in decisions to discipline or terminate an employee, only to administer and communicate the discipline or termination.").

[6] Because the Court has granted summary judgment for the SAO on each claim, it also grants summary judgment as to Cook County, a party present solely for indemnification purposes.